**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
––––––––––––––––––––––––––––––––––––––––

**TIMOTHY HIDALGO,**

                    **Plaintiff,**　　　　　　　**19-cv-10545 (JGK)**

      **- against -**　　　　　　　　　**OPINION & ORDER**

**AMATEUR ATHLETIC UNION OF THE UNITED**
**STATES, INC.,**

                   **Defendant.**
––––––––––––––––––––––––––––––––––––––––

**JOHN G. KOELTL, District Judge:**

The defendant, the Amateur Athletic Union of the United States, Inc. (the "AAU"), moves to compel arbitration on the claims brought by the plaintiff, Timothy Hidalgo, for common law negligence, negligence per se, and breach of implied contract, as well as for statutory violations of the New York General Business Law, N.Y. Gen. Bus. Law § 349(a) and the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1. All the plaintiff's claims arise out of a data breach that allegedly resulted in financial losses, identity theft, and other injuries to people, like the plaintiff, who had personal information, including credit card and debit card information, stored with the AAU. The defendant also moves to stay this litigation pending arbitration.

For the reasons that follow, the defendant's motion to compel arbitration and its motion to stay this action pending arbitration are **granted**.

1

**I.**

The following facts are undisputed unless otherwise indicated.

**A.**

The AAU is a non-profit, volunteer-based, multi-sport event organization that promotes and develops amateur sports and physical fitness programs for youths and adults. Kimbrell Decl. ¶ 2. Individuals may apply to become members of the AAU as athletes or non-athletes; the latter category includes coaches, administrators, managers, instructors, and officials. Id. Individuals may apply for AAU membership by filling out an online application at https://aausports.org (the "Website"). Id. at ¶¶ 3, 6 & Ex. A.

The AAU online membership application contains many questions that require the applicant to answer. At the end of the application is a section that is replicated here:

and/or volunteer services to/for the AAU.

☐  I would like a copy of the consumer report(s) (also known as 'Investigative Consumer Report' under California law) at no charge if obtained by the AAU

☐  * I have read and agree to the terms and conditions and authorize AAU to request the background screening

## Are you a member of a club?

● No, not at this time (can be updated later)

NOTE: Make sure you update this membership to associate it with a club if joining one later on.

○ Yes

## Terms and Conditions - Digital Signature

Membership in the AAU is a privilege granted by the AAU. It is not a right. The AAU at its sole discretion reserves the right to accept or reject any applicant(s) for membership.

Membership in any category may be granted only after an application is submitted and approved. By submitting an application, the applicant agrees to comply with all the provisions of the AAU Code, including its constitution, bylaws, policies, procedures, regulations, and rules.

* I accept all terms and conditions for this AAU membership application as laid out by the AAU code book (available here) and this application.

* I hereby certify that all information I have provided is accurate, my name (below) is correct, and I am authorized to apply for membership for the person in this application.

* I understand that there are no refunds issued for cancellations or failure to pass background screening process.

☐  * I understand and agree to all terms and conditions listed

By entering my name below I hereby authorize AAU to perform a background screening for my adult membership, accept and acknowledge all terms and conditions presented to me during the application process.

By entering my name below I hereby authorize AAU to create the requested membership, accept and acknowledge all terms and conditions presented to me during the application process.

NOTE: THIS MUST BE SIGNED BY THE PERSON APPLYING FOR MEMBERSHIP OR A PARENTALLY APPROVED REPRESENTATIVE FOR YOUTH APPLICANTS.

* First Name:  [                    ]

Middle Name:  [                    ]

* Last Name:  [                    ]

Cancel          Continue

Kimbrell Decl., Ex. A.

Before submitting the application by clicking the green "Continue" button in the bottom right corner, an applicant must, among other things, check a box that appears to the immediate left of the words "*I **understand and agree to all terms and conditions listed**." Kimbrell Decl. at ¶¶ 6-8 (bold and color in original). The check box and the accompanying text appear at the bottom of a yellow box in the application immediately below the bold heading "**Terms and Conditions – Digital Signature**." Id. (bold in original). One of the statements in the "terms and conditions" section of the application is the statement that

> Membership in any category may be granted only after an application is submitted and approved. By submitting an application, the applicant agrees to comply with the provisions of the AAU Code, including its constitution, bylaws, policies, procedures, regulations, and rules.

Id. at ¶ 7 (color in original). The blue text is a hyperlink that takes the applicant to a separate "AAU Code Book" screen. Id. at ¶ 8. Also in the "terms and conditions" section is the statement "*I accept all terms and conditions for this AAU membership application as laid out by the AAU code book (available here) and this application." Id. (color in original). The blue text, "available here," is another hyperlink that takes the applicant to the same AAU Code Book screen. Id. Additionally, in the green box in the "terms and conditions"

4

section of the application is the statement "By entering my name
below, I hereby authorize AAU to create the requested
membership, accept and acknowledge all terms and conditions
presented to me during the application process." Id. at Ex. A.

Regardless which of the two hyperlinks one uses to access
the AAU Code Book screen from the application page, the
resulting page that a user is taken to displays the table of
contents of the AAU Code Book. Id. at ¶¶ 10-11 & Ex. B. On the
table of contents page, a complete PDF version of the AAU Code
Book can be accessed by clicking on a button near the top of the
AAU Code Book screen labeled "Complete Book." Id. at Ex. B. The
AAU Code Book screen also contains hyperlinks to each chapter
contained within the AAU Code Book, one of which is titled
"Policies." Id. Adjacent to the "Policies" heading in the table
of contents on the AAU Code Book screen is a hyperlink that
reads "AAU National Policies of the AAU." Id. (underline and
color in original). In the "Policies" section of the table of
contents, the first subheading is labeled "Membership Policy"
and a sub-subheading below the "Membership Policy" subheading is
labeled "Binding Arbitration." Id. Upon clicking on the
hyperlink labeled "AAU National Policies of the AAU," the web
user is then directed to a screen that displays the specific
pages of the larger AAU Code Book containing the "AAU National
Policies." Id. at ¶¶ 11-12 & Ex. C.

The "Binding Arbitration" provision contained in the AAU National Policies, which appears in bold text and in capital letters, reads as follows:

**B. BINDING ARBITRATION**

**1. BY APPLYING FOR AAU MEMBERSHIP (OR HAVING A THIRD PARTY SUBMIT AN APPLICATION FOR MEMBERSHIP IN THE AAU ON BEHALF OF THE APPLICANT), OR UPON ENTERING ANY AAU EVENT, THE APPLICANT/MEMBER/ENTRANT AND THE AAU AGREE TO SUBMIT ALL CIVIL DISPUTE(S) ARISING OUT OF OR DURING THE TERM OF MEMBERSHIP TO BINDING ARBIRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN ACCORDANCE WITH ITS CONSUMER ARBITRATION RULES. THE ARBITRATION HEARING SHALL BE HELD IN NEW YORK, NEW YORK BEFORE ONE (1) ARBITRATOR.**
**2. DEPOSITION(S), REQUESTS FOR ADMISSIONS, AND REQUESTS FOR PRODUCTION OF DOCUMENTS ARE STRICTLY DISCOURAGED AND WILL NOT BE ALLOWED WITHOUT AN ORDER FROM AAA; AND, IN ORDER TO BE CONSIDERED, A REQUEST FOR ANY SUCH ORDER, IF ANY, SHALL ACCOMPANY THE FILING OF THE APPLICABLE PARTY'S FIRST SUBMISSION TO AAA OR SUCH REQUEST SHALL BE WAIVED AND/OR DENIED. A LIST OF WITNESSES AND ALL EXHIBITS TO BE INTRODUCED AT THE HEARING WILL BE EXCHANGED AT LEAST TWENTY (20) DAYS PRIOR TO THE HEARING. THE PARTIES AGREE THAT THE BINDING ARBITRATION SHALL BE IN LIEU OF ANY LITIGATION BY AND BETWEEN ALL OF THE PARTIES RELATED TO THE DISPUTE.**
**3. THE PARTIES DECLARE THAT IT IS THEIR CLEAR AND UNMISTAKABLE INTENT FOR THE ARBITRATOR TO DETERMINE ANY AND ALL QUESTIONS OF ARBITRABILITY, IF ANY. ANY OBJECTION TO THE ARBITRATOR'S JURISDICTION, INCLUDING ANY OBJECTIONS WITH RESPECT TO THE EXISTENCE, SCOPE OR VALIDITY OF THE ARBITRATION AGREEMENT SHALL BE DECIDED BY THE ARBITRATOR.**
**4. THE PARTIES WILL BE RESPONSIBLE FOR THEIR OWN LEGAL FEES, COSTS AND COST OF WITNESSES. THE PARTIES WILL SHARE EQUALLY THE ARBITRATOR'S FEES AND COSTS. THE PARTIES WAIVE ANY RIGHT TO SEEK AND THE PARTIES COVENANT NOT TO SEEK, ANY PUNITIVE OR EXEMPLARY DAMAGES.**

Id. at ¶ 13 & Ex. C.

On May 16, 2019, the plaintiff applied for membership with the AAU by filling out an application on the Website. Kimbrell Decl. ¶ 4.[1] The plaintiff used his debit card to pay the $32.00 fee for a coach's certificate at the time he submitted his application. Compl. ¶ 19. The plaintiff applied for membership by accessing the Website on the Safari web browser application on his iPhone. Hidalgo Decl. ¶¶ 4-7. Because he used his iPhone to complete the membership application the plaintiff allegedly "had to move the screen back and forth for each line of text. By pinching [his] fingers together on the screen [he] could zoom out and see more of the Application, but even then the full application was not visible and it would pop back to the misconfigured size when [he] lifted [his] fingers from the screen." Id. at ¶ 7 & Ex. A. Nevertheless, the plaintiff states that the image of the membership application reproduced above "may well be essentially the same as the application [he] filled out in May 2019, although . . . due to the lack of mobile compatibility, he never saw it formatted as a unified document." Id. at ¶ 8. The plaintiff states that he "remember[s] a section that talked about terms and conditions for background check and another yellow box that talked about terms and conditions of

---

[1] The plaintiff alleges that he applied for membership with the AAU on or about May 17, 2019. Compl. ¶ 19. The defendant alleges that the May 16, 2019 date comes from a review of business records maintained by the AAU in the ordinary course of business. Kimbrell Decl. ¶ 4. Any discrepancy between the two dates is not material in this case.

membership. The second terms and conditions box talked about how membership was not guaranteed by just filling out the application and that members had to comply with the AAU Code and its constitution and rules." Id. at ¶ 10.

When the plaintiff applied for membership he necessarily checked the box in the "terms and conditions" section adjacent to the statement "*I understand and agree to all terms and conditions listed" because, had he not checked the box, an error message would have popped up on the screen when he attempted to click the "Continue" button at the bottom right of the application. Kimbrell Decl. ¶ 9. The plaintiff's membership was accepted by the AAU on May 29, 2019, roughly two weeks after he applied, and the plaintiff thereafter became eligible to participate in the AAU's youth program as a coach or other kind of volunteer. Hidalgo Decl. ¶ 16 & Ex. B.

### B.

Private information, including credit and debit card information, of individuals who conducted transactions on the Website between October 1, 2018 and July 2, 2019, including that information from the plaintiff, was subject to a data breach that the AAU publicly disclosed in September 2019. Compl. ¶ 3. The plaintiff generally alleged in the Complaint that the AAU "failed to take reasonable steps to employ adequate security measures or to properly protect sensitive payment Personal

Information" and that in the aftermath of the breach, AAU's actions in remedying the injuries of victims of the breach were inadequate. See generally id. at ¶¶ 33-66.

On November 13, 2019, the plaintiff brought this case as a class action on behalf of "[a]ll residents of the United States whose Personal Information was compromised as a result of the data breach first disclosed by AAU in September 2019." Id. at ¶ 67. The plaintiff brought claims for common-law negligence, negligence per se, breach of implied contract, unjust enrichment, violations of the Rhode Island Deceptive Trade Practices Act, §§ 6-13.1-1 et seq., and violations of the New York General Business Law, N.Y. Gen. Bus. Law § 349(a). Id. at ¶¶ 78-134.

The defendant now moves moves pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., to compel arbitration of the plaintiff's claims and stay the case pending arbitration.

**II.**

Under the FAA, 9 U.S.C. § 4, "a district court must enter an order to arbitrate upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 n.27 (1983) (quotation marks omitted). A court considering whether to compel arbitration pursuant to a

purported arbitration agreement must decide "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." Hartford Accident & Indemn. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001) (internal quotation marks and citation omitted).

"The determination of whether parties have contractually bound themselves to arbitrate a dispute – a determination involving interpretation of state law – is a legal conclusion." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002) (Sotomayor, J.). Thus, "[w]hen deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see also Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 749-50 (S.D.N.Y. 2017). "It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and a manifestation of mutual assent.'" Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019).[2] "When an offeree does not have actual notice of certain contract terms, he is nevertheless bound by such terms

---

[2] The parties agree that New York law should govern in this case.

if he is on <u>inquiry</u> notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." <u>Id.</u> at 289 (emphasis in original).

"New commerce on the Internet . . . has not fundamentally changed the principles of contract." <u>Register.com v. Verio, Inc.</u>, 356 F.3d 393, 403 (2d Cir. 2004). Applying ordinary contract law principles, courts routinely uphold "'clickwrap' (or 'clickthrough') agreements, which require users to click an 'I agree' box after being presented with a list of terms and conditions of use" "for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" <u>Meyer v. Uber Techs., Inc.</u>, 868 F.3d 66, 75 (2d Cir. 2017) (applying California law but noting that New York and California apply substantially the same rules for determining whether there has been mutual assent necessary to form a contract). However, in order to be bound by an arbitration agreement contained in a clickwrap agreement, the web-user must have "reasonable notice of the arbitration provision." <u>Starke</u>, 913 F.3d at 292; <u>see also</u> <u>Feld v. Postmates, Inc.</u>, -- F. Supp. 3d --, 2020 WL 1047055, at *3 (S.D.N.Y. Mar. 3, 2020).

Upon satisfying itself that an agreement to arbitrate exists, the district court must then decide whether the claims at issue are within the scope of the arbitration agreement. <u>See</u> <u>Meyer</u>, 868 F.3d at 74. When there are issues concerning the

11

scope of an arbitration agreement and whether particular disputes sought to be arbitrated fall within that scope, also known as issues of arbitrability, those issues are generally "for judicial determination 'unless the parties clearly and unmistakably provide otherwise.'" NASDAQ OMX Grp., Inc. v. UBS Securities, LLC, 770 F.3d 1010, 1031 (2d Cir. 2010) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)); see also Contec Corp. v. Remote Sol., Co., Ltd., 398 F.3d 205, 208-09 (2d Cir. 2005).

"In deciding motions to compel, courts should apply a 'standard similar to that applicable for a motion for summary judgment.'" Nicosia v. Amazon.com, 834 F.3d 220, 229 (2d Cir. 2016) (quoting Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). Thus, a court should "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" and "must draw all reasonable inferences in favor of the non-moving party." Id. (internal quotation marks, alteration and citations omitted). The court must order arbitration "if there is no genuine issue of material fact regarding the requirements to compel arbitration." Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co., 203 F. Supp. 3d 312, 317 (S.D.N.Y. 2016).

12

### III.

The first question is whether the plaintiff and the defendant entered into a valid and enforceable agreement to arbitrate. With respect to this question, the parties dispute only whether the plaintiff had "reasonable notice" of the arbitration provision contained in the AAU Code Book sufficient for the plaintiff to manifest assent to the terms of the arbitration provision by virtue of completing the AAU membership application and becoming a member of the AAU.

### A.

When determining whether a plaintiff assented to the terms of a web-based contract, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." Starke, 913 F.3d at 289. In a series of recent cases, Nicosia v. Amazon.com, Meyer v. Uber Technologies, and Starke v. SquareTrade, the Court of Appeals has developed a framework for determining whether a web user has "reasonable notice" of an arbitration provision contained in a document that can be accessed through a hyperlink provided to the user. See Starke, 913 F.3d at 292 ("The reasoning of Nicosia and Meyer provides the framework within which we analyze the validity of assent to terms and conditions presented through a web interface.").

13

In Nicosia, the Court of Appeals found that the plaintiff had plausibly pleaded that he was not bound by Amazon.com's Conditions of Use when he placed an online order.[3] The Amazon.com order page contained language near the top of the page that "By placing your order, you agree to Amazon.com's privacy notice and conditions of use," where "privacy notice" and conditions of use" were hyperlinks in blue font. Nicosia, 834 F.3d at 235-36, 241. In finding that the plaintiff had plausibly pleaded that there was no constructive notice of Amazon.com's conditions of use, the Court of Appeals noted a number of facts about the layout of the Amazon.com order page that, taken together, deprived the plaintiff of "reasonable notice" of the conditions of use that would purportedly become binding upon placing an order with Amazon.com. These facts included that "the critical sentence appears in smaller font" than the "Review your order heading"; "unlike typical 'clickwrap' agreements, clicking 'Place your order' does not specifically manifest assent to the additional terms, for the purchaser is not specifically asked whether she agrees or to say 'I agree'"; the message alerting a user that placing the order constituted agreement to be bound by the conditions of use was not "bold, capitalized, or conspicuous in light of the whole webpage"; and the page itself contained

---

[3] The court in Nicosia applied Washington law to the question of contract formation, but "Washington law is the same as New York law with respect to the issue of contract formation." Starke, 913 F.3d at 290 n.7.

"between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors . . . alongside multiple buttons and promotional advertisements." Id. at 235-37.

In Meyer, the Court of Appeals enforced an arbitration provision contained in the "terms of service & privacy policy" that could be accessed on the registration screen of the Uber smartphone application. 868 F.3d at 81. In finding that a user would have reasonable notice of the existence of the arbitration provision, the Court of Appeals noted at the outset that "precedent and basic principles of contract law instruct that we consider the perspective of a reasonably prudent smartphone user," and that "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." Id. at 77-78. The Court of Appeals found that the Uber smartphone interface provided "reasonable notice" based on a number of facts about the layout of the interface, namely that the screen was "uncluttered"; the "text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appears directly below the buttons for registration"; "the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined"; the "notice of the Terms of Service is provided simultaneously to enrollment"; and

"[o]nce a user clicks through to the Terms of Service, the section heading ('Dispute Resolution') and the sentence waiving the user's right to a jury trial on relevant claims are both bolded." Id. at 78-79.

In Starke, the Court of Appeals found that a user did not have reasonable notice of an arbitration provision that could be accessed through a "terms and conditions" hyperlink contained in the confirmation email of a purchase made on Amazon.com. 913 F.3d at 285. In finding that the plaintiff did not have reasonable notice of the provision that could be accessed through the "terms and conditions" hyperlink, the Court of Appeals noted that the company that sought to compel arbitration had "never directed Starke's attention to the 'Terms & Conditions' hyperlink that contained the post-Sale T&C"; the information unrelated to the terms and conditions hyperlink "took up approximately half of the email"; the hyperlink itself "is some of the smallest text in the email and comes after several prompts unrelated to the enclosure of the contract"; the "interface here is cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and promotional advertisements that distract the reader from the relevant hyperlink"; the subsequent "email in no way signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in

16

the document to be found by clicking that link"; and the terms and conditions were both spatially and temporally decoupled from the purchase that Starke had made on Amazon.com. Id. at 292-94.

These cases make clear that the inquiry whether a web user had "reasonable notice" of contract terms contained in a contract accessible by hyperlink depends on the "totality of the circumstances." Id. at 296; Feld, 2020 WL 1047055, at *3 ("Whether a user is on inquiry notice is a fact-intensive analysis.") (citing Meyer, 868 F.3d at 76). These cases provide the framework for the inquiry in this case as to whether the plaintiff assented to the arbitration provision contained in the AAU Code Book by submitting his application for membership in the AAU and becoming a member of the AAU.

### B.

In this case, the plaintiff had "reasonable notice" that by completing his application for AAU membership and becoming a member of the AAU, he would be bound by contractual language contained in the documents, including the binding arbitration provision, that could be accessed through the hyperlinks on the AAU application page. On the Website, an applicant's "attention is adequately directed to a conspicuous hyperlink that is clearly identified as containing contractual terms to which the customer manifests assent" by completing the AAU membership application. Starke, 913 F.3d at 296. An applicant has

17

"reasonable notice" of the arbitration provision contained in the AAU Code Book based on several facts about the layout of the AAU membership application page.

First, the AAU application page is relatively uncluttered. The relevant part of the application page is labeled "Terms and Conditions – Digital Signature" in large bold font. The section is in a distinctive yellow color. Within that section, the provisions of the AAU Code that a member agrees to comply with can be accessed through the hyperlinks and are marked with the distinctive blue color characteristic of hyperlinks.[4] Although the membership application page has various colors, the layout is not distracting like the layout of the web page in Nicosia in which there were "between fifteen and twenty-five links," in text of "at least four font sizes and six colors," and various buttons and advertisements. 834 F.3d at 237. The relevant text in the "terms and conditions" box on the AAU application screen clearly draws a reasonable user's attention to it because of the blue hyperlinks, the red asterisks, the normal font size, and the clear contrast between the mostly black text and the yellow background. See Peter v. DoorDash, Inc., -- F. Supp. 3d --, 2020

---

[4] The plaintiff suggests that a reasonable user would be confused by the fact that there were multiple different terms and conditions. But as the plaintiff himself admits, he "remember[s] a section that talked about terms and conditions for background check and another yellow box that talked about terms and conditions of membership." Hidalgo Decl. ¶ 10. There are two hyperlinks inside the "Terms and Conditions" box on the application and both hyperlinks would take a web user to the same AAU Code Book screen.

WL 1967568, at *4 (N.D. Cal. Apr. 23, 2020) ("DoorDash's sign-up page looks markedly similar to the page approved by Meyer . . . Despite plaintiff's characterization of the font as gray-on-gray, the text contrasts clearly with the background and is plainly readable."). The "terms and conditions" box is also prominently placed squarely in the middle of the very end of the application, which is a conspicuous part of the application because it is the last place an applicant looks before finishing the application process.

Second, although the court in Meyer noted that reasonable notice was given, in part, because "the entire screen [was] visible at once, and the user [did] not need to scroll beyond what [was] immediately visible to find notice of the Terms of Service," 868 F.3d at 78, the fact that an applicant would have to scroll down through many pages of the application to reach the terms and conditions box does not undermine the plaintiff's assent to those terms and conditions. An applicant for AAU membership would be unable to avoid the part of the application containing the hyperlinks leading to the AAU Code Book because the applicant would necessarily proceed through the application in linear fashion and could not complete the application without having reviewed that page.

Third, the agreement in this case is a clickwrap agreement in which an applicant necessarily checks the box adjacent to the

acknowledgment of the terms and conditions to indicate his agreement with the AAU terms and conditions listed, one of which is compliance with the contents of the AAU Code Book. The declaration of Debra Kimbrell shows that it would have been impossible for the plaintiff to complete his membership application without checking the box that gave assent to the terms and conditions. See Sultan v. Coinbase, Inc., 354 F. Supp. 3d 156, 161-62 (E.D.N.Y. 2019). The plaintiff therefore assented to the terms and conditions when he checked the box indicating that he was aware of the existence of the clickwrap agreement. See Armstead v. Starbucks Corp., No. 17-cv-1163, 2017 WL 5593519, at *3 (S.D.N.Y. Nov. 17, 2017) ("Meyer concluded that a party has typically consented to arbitration when she agreed to a 'clickwrap' or 'click-through' agreement."). Moreover, the language that "[b]y submitting an application, the applicant agrees to comply with the provisions of the AAU Code," contained in the "terms and conditions" box on the AAU application screen, is a "clear prompt directing users to read the [AAU Code Book] and signaling that their acceptance of the benefit of registration would be subject to contractual terms." Meyer, 868 F.3d at 78-79.[5]

_____

[5] It appears that the plaintiff in this case also had actual notice that he would be bound by the terms and conditions in the AAU Code. As the plaintiff stated in his declaration, he "remember[s] a section that talked about terms and conditions for background check and another yellow box that talked about terms and conditions of membership. The second terms and conditions box

Fourth, the fact that notice about the terms and conditions of AAU membership was both spatially and temporally coupled to the applicant's submission of an application further indicates that the plaintiff had "reasonable notice" that he would be bound by the attendant terms and conditions upon becoming an AAU member. See Meyer, 868 F.3d at 78 ("In addition to being spatially coupled with the mechanism for manifesting assent – i.e., the register button – the notice is temporally coupled."). In this case, the check box in which a user manifested assent to the terms and conditions contained in the AAU Code Book appeared in close proximity to the two hyperlinks to the AAU Code Book and all were contained within the box plainly labeled "Terms and Conditions – Digital Signature." Notice of the terms and conditions of membership, including being bound by the contents of the AAU Code Book was also temporally coupled to the plaintiff's application because notice appeared on the application page itself and therefore notice is given to an applicant "simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply." Id.

Based on these facts, the plaintiff had "reasonable notice" that upon completing his membership application with the AAU and

---

talked about how membership was not guaranteed by just filling out the application and that members had to comply with the AAU Code and its constitution and rules." Hidalgo Decl. ¶ 10.

becoming a member, he would be bound by the arbitration provision indisputably contained in the AAU Code Book that could be accessed through the hyperlinks conspicuously displayed on the AAU membership application page. The plaintiff's arguments to the contrary are without merit.

The plaintiff argues that because he applied for membership on an iPhone using a web browser and the AAU application was not compatible for smartphone use, he did not have reasonable notice that he would be bound by the AAU Code Book. Specifically, the plaintiff complains that he "had to move the screen back and forth for each line of text" and zoom in and out because the full application was not visible on the iPhone screen at one time. Hidalgo Decl. ¶ 7 & Ex. A. However, the plaintiff does not dispute that even though he used his iPhone to complete the membership application, there was a check box for him to click to agree to the "terms and conditions." In fact, the plaintiff states that he remembers seeing the "terms and conditions" box when he applied for membership. The plaintiff therefore had reasonable notice of the need to agree to the terms and conditions even though he used an iPhone to complete his AAU membership application.

In any event, the relevant question is whether a "reasonably prudent smartphone user" would have inquiry notice that he would be bound by the contract provisions contained in

the AAU Code Book upon completing the AAU membership
application. See Meyer, 868 F.3d at 77-78. The plaintiff points
to no authority for the proposition that a reasonably prudent
smartphone user does not have inquiry notice of terms and
conditions when the user physically checks a box indicating that
the user understands and agrees to the terms and conditions. See
Peter, 2020 WL 1967568, at *4 (finding that in the context of
the plaintiffs' argument that the terms and conditions would not
have been readable on a smartphone that "Plaintiffs cite no
authority regarding acceptable font size in the digital
context."). Moreover, the plaintiff fails to articulate why a
"reasonably prudent smartphone user" would not have reasonable
notice of the hyperlinks on the AAU application page simply
because the smartphone user had to scroll around and zoom in and
out on certain text on the smartphone screen to complete the
application. See Meyer, 868 F.3d at 77-78.

The plaintiff also argues that he should not be bound by
the arbitration provision in the AAU Code Book because it was
not obvious that the AAU Code Book contained contractual
language rather than simply a general code of conduct governing
matters like sportsmanship at AAU events. The text in the
application stated that "Membership in any category may be
granted only after an application is submitted and approved. By
submitting an application, the applicant agrees to comply with

23

the provisions of the AAU Code, including its constitution, bylaws, policies, procedures, regulations, and rules." Kimbrell Decl. ¶ 7 (color in original). The plaintiff provides no support for the argument that the phrase "the AAU Code, including its constitution, bylaws, policies, procedures, regulations, and rules" does not provide "reasonable notice" to an applicant that the applicant could be bound contractually by provisions contained in the AAU Code. The relevant portion of the AAU membership application is labeled "Terms and Conditions – Digital Signature," which is standard language used in web-based contracts to indicate the existence of contractual language. See generally, Meyer, 868 F.3d at 78 (discussing Uber's "terms and conditions"). There is no merit or authority for the plaintiff's argument that he did not have "reasonable notice" that the AAU Code Book created an enforceable contract between the parties.

The plaintiff also argues that because the arbitration provision was allegedly "hidden" in the middle of the roughly 170-page AAU Code Book accessible through the hyperlinks, he did not have notice of the arbitration provision. But the fact that an applicant on the AAU Website, such as the plaintiff, was required to click through multiple hyperlinks - first to the AAU Code Book, then to the "Policies" chapter - to reach the specific part of the AAU Code Book containing the arbitration provision does not mean that the plaintiff cannot be bound by

the arbitration provision because "clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket [containing an enforceable forum-selection clause at issue in Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 587-88 (1991)]" to read the fine print. Fteja v. Facebook, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012); Feld, 2020 WL 1047055, at *5 ("Whether Feld actually clicked on the hyperlinked terms to read the TOS or the Privacy Policy is immaterial; what matters is that notice of these terms was reasonably conspicuous.").

The plaintiff's argument that he cannot be bound by the arbitration provision because he either did not or could not have been expected to read the full 170-page document contained in the AAU Code Book runs counter to well-settled principles of contract law. Under "New York law, a customer does not have the right to avoid a contract on the ground that he did not read it." Crewe v. Rich Dad Educ., LLC, 884 F. Supp. 2d 60, 73-74 (S.D.N.Y. 2012) (collecting cases); Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 122 (2d Cir. 2010) ("Further, Ragone asserts that she did not read the arbitration agreement before signing it. But this is of no moment . . . ."). Additionally, an applicant would not have to scroll through the entire roughly 170-page AAU Code Book because the AAU Code Book Screen contained a much shorter table of contents. Under the

25

"Policies" section of the AAU Code Book table of contents was a
section clearly labeled "Binding Arbitration."

The plaintiff has failed to raise any issue of triable fact
as to whether he had "reasonable notice" that he would be bound
by the arbitration provision contained in the AAU Code Book upon
completing his application for membership in the AAU. There is
therefore no dispute that the plaintiff assented to the
arbitration provision when he checked the box on the AAU
membership application page indicating his agreement with all
the terms and conditions listed and then submitted the
membership application. See Sultan, 354 F. Supp. 3d at 162.

### C.

The next question is whether the particular claims brought
by the plaintiff against the defendant are within the scope of
the arbitration provision.

The arbitration provision provides that "by applying for
AAU membership (or having a third party submit an application
for membership in the AAU on behalf of the application), or upon
entering any AAU event, the applicant/member/entrant and the AAU
agree to submit all civil dispute(s) arising out of or during
the term of membership to binding arbitration administered by
the American Arbitration Association ("AAA") in accordance with
its consumer arbitration rules." Kimbrell Decl., Ex. C. The
arbitration provision further provides that "the parties declare

26

that it is their clear and unmistakable intent for the arbitrator to determine any and all questions of arbitrability, if any. Any objection to the arbitrator's jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement shall be decided by the arbitrator." Id.

The plaintiff argues principally that because the plaintiff's payment information was stolen from AAU's website when he applied for membership on May 16, 2019, thirteen days before the plaintiff's AAU membership began, the dispute between the plaintiff and the defendant in this case does not "arise[e] out of or during the term of membership[.]"

However, this Court cannot decide the issue whether the dispute between the plaintiff and the defendant is arbitrable because the parties agreed to "empower an arbitrator to decide issues of arbitrability," and that empowerment "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Contec Corp., 398 F.3d at 208. Courts have upheld and enforced delegation clauses similar to the clause in this case, which principally states that "it is [the parties'] clear and unmistakable intent for the arbitrator to determine any and all questions of arbitrability, if any" and that "[a]ny objection to the arbitrator's jurisdiction, including any objections with respect to the existence, scope or

validity of the arbitration agreement shall be decided by the arbitrator." See, e.g., Mumin v. Uber Techs., Inc., 239 F. Supp. 3d 507, 522-23 (E.D.N.Y. 2017).[6]

In light of the broad delegation to the arbitrator of issues of arbitrability, the plaintiff's argument that his claims are not covered by the arbitration provision because the claims do not "aris[e] out of or during the term of membership" is an argument that must be submitted to the arbitrator in the first instance. See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."); Olsen v. Charter Commc'ns, Inc., Nos. 18-cv-3388

---

[6] Although the defendant did not rely on the arbitration provision's clause stating that arbitration between the parties will be "administered by the American Arbitration Association ('AAA') in accordance with its consumer arbitration rules" for the argument that the arbitrator must decide issues of arbitrability, the incorporation of AAA rules in the arbitration provision constitutes independent "clear and unmistakable" evidence that the parties intended that the arbitrator decide issues of arbitrability. See Sollinger v. SmileDirectClub, LLC, No. 19-cv-5977, 2020 WL 774135, at *3 (S.D.N.Y. Feb. 18, 2020) ("One example of 'clear and unmistakable evidence' is the parties' choice to 'incorporate by reference the Rules of the American Arbitration Association,' because the AAA's rules include an instruction that arbitrators are to determine their own jurisdiction.") (alterations omitted) (quoting Contec Corp., 398 F.3d at 211), appeal docketed, No. 20-965 (2d Cir. Mar. 17, 2020); Offshore Exploration and Production LLC v. Morgan Stanley Private Bank, N.A., 986 F. Supp. 2d 308, 316 (S.D.N.Y. 2013) (same), aff'd, 626 F. App'x (2d Cir. 2015).

& 18-cv-4972, 2019 WL 3779190, at *8 (S.D.N.Y. Aug. 9, 2019).
Therefore, all of the plaintiff's claims must be submitted to
arbitration as provided for in the arbitration provision
contained in the AAU Code Book. It will be for the arbitrator to
decide whether any of the plaintiff's claims are beyond the
scope of the arbitration agreement.

## IV.

The defendant requests that the Court stay this case
pending arbitration if it grants the defendant's motion to
compel arbitration.

The FAA provides that where a court is called upon to
adjudicate a motion to compel arbitration, "the court in which
such suit is pending, upon being satisfied that the issue
involved in such suit or proceeding is referable to arbitration
under such an agreement, shall on application of one of the
parties stay the trial of the action until such arbitration has
been had in accordance with the terms of the agreement,
providing the applicant for the stay is not in default in
proceeding with such arbitration." 9 U.S.C. § 3. A stay of the
proceedings is mandatory "after all claims have been referred to
arbitration and a stay [has been] requested." Katz v. Cellco
P'ship, 794 F.3d 341, 345 (2d Cir. 2015).

In this case, all claims have been ordered to be submitted
to arbitration and the defendant has requested that the Court

enter a stay of proceedings in this Court pending the outcome of the arbitration. Therefore, this case is stayed pending the outcome of the arbitration.

<strong>CONCLUSION</strong>

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit. The motion to compel arbitration is **granted**. The motion to stay this action pending the outcome of arbitration is **granted**. The parties should report back to the Court promptly at the conclusion of the arbitration. The Clerk is directed to stay this case. The Clerk is also directed to close Docket Nos. 10 and 24.

**SO ORDERED.**

**Dated:    New York, New York
           June 16, 2020**

                          _____ /s/ John G. Koeltl_____
                               John G. Koeltl
                          United States District Judge